UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 23-cr-4444 (JEB) |
| v. : | |
| : | |
| GENE DIGIOVANNI, JR., : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Gene DiGiovanni, Jr. to 30 days of incarceration, at the low end of the guideline range, twelve months' supervised release, 60 hours of community service, $500 in restitution, and a $25 special assessment.

I.   Introduction

Defendant Gene DiGiovanni, a business owner and alderman, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

DiGiovanni pleaded guilty to a single violation of 18 U.S.C. § 1752(1)(1), Entering or Remaining within a Restricted Building or Grounds. Thirty days of incarceration for that conviction is amply warranted here: DiGiovanni entered the United States Capitol building despite obvious signs that he should not (including OC-spray in the air, verbal attacks hurled at police, and blaring alarms); he remained in the Capitol for over twenty minutes and then stayed even longer on Capitol Grounds to celebrate the mob's breach of the Capitol building; and he has failed express real remorse or recognition of the import of his actions from that day.

The defendant's conduct on January 6 took place in the context of a massive and violent riot in which an unauthorized and violent mob overwhelmed police, breached the Capitol, and disrupted the proceedings. The defendant's actions, and his decision to participate in overrunning the U.S. Capitol alongside so many others, contributed to the disruption of Congress on January 6. Here, the facts and circumstances of DiGiovanni's crime support a sentence of 30 days of incarceration.

## II. Factual and Procedural Background

<u>The January 6, 2021, Attack on the Capitol</u>

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Facts, Doc. 1-1.

<u>Defendant DiGiovanni's Role in the January 6, 2021, Attack on the Capitol</u>

The defendant, Gene DiGiovanni, Jr., of Derby, Connecticut, travelled to Washington, D.C., on January 6, 2021, to attend former President Trump's "Stop the Steal" rally. He arrived wearing a red Trump hat and a navy jacket identifying his family business. After attending the

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

rally, DiGiovanni marched with other rioters down the National Mall to the western grounds of the Capitol. Along the way, DiGiovanni joined in chants and cheers with the crowd. *See* Image 1. DiGiovanni appears to have recorded much of the day on his cell phone. *See* Images 1, 7, 10.



*Image 1: Screenshot from an open source video[2] showing DiGiovanni (circled in yellow)*

Once on the U.S. Capitol grounds, DiGiovanni continued to the West Plaza where police officers defending the Capitol building attempted to repel the growing crowd with non-lethal crowd control measures such as OC-spray. *See* Image 2. Near DiGiovanni, other rioters on the West Plaza complained loudly about the OC-spray.

---

[2] Video available at: https://ia802307.us.archive.org/1/items/Bk87MK33bdFQLWf7Y/ thebrain0247_10000000_402.mpeg4.



*Image 2: Screenshot from an open source video[3] showing DiGiovanni (circled in yellow) on the West Plaza*

DiGiovanni nevertheless continued to push towards the Capitol building with the crowd, where he first walked through the scaffolding in place for the inaugural stage and then up the Northwest staircase to the Upper West Terrace. *See* Images 3 and 4.

---

[3] Video available at: https://archive.org/details/EZQLZCi8e5BBFqMnY.




*Image 3: Screenshot from an open source video[4] showing DiGiovanni (circled in yellow) approaching the inaugural stage scaffolding*

*Image 4: Open source photograph showing DiGiovanni (in yellow box) on the Northwest Stairs to the Capitol*

DiGiovanni reached the Upper West Terrace, where rioters chanted "Our house!" and "Take it back!" as they sought entry to the Capitol and cheered other rioters who tried to break windows. *See* Image 5. While DiGiovanni was on the Upper West Terrace, another rioter can be heard yelling through a microphone, "They can't stop us all!" At the same time, police officers were visibly blocking access to the building through the Parliamentarian Door.

---

[4] Video available at: https://web.archive.org/web/20210111051111/https://video.parler.com/xH/kU/xHkUeMHMFx3F.mp4.



*Image 5: DiGiovanni (circled in yellow) on the Upper West Terrace of the Capitol, outside the Senate Wing Door (pointed out with a white arrow) and Parliamentarian Door (boxed in white)*

DiGiovanni lingered on the Upper West Terrace near the Senate Wing Door and Parliamentarian Door before he entered the building through the Upper West Terrace door at approximately 2:38 p.m. *See* Image 6. The Upper West Terrace door was an alarmed door that does not open from the outside; the loud alarm was sounding as DiGiovanni entered the Capitol building. Vice President Pence had been evacuated from his Senate-wing office at 2:25 p.m., just thirteen minutes prior to DiGiovanni's entry into the building.



*Image 6: Screenshot of CCTV showing DiGiovanni's entry into the building*

6

Once inside the Capitol building, DiGiovanni walked through the Rotunda, Statuary Hall, and other corridors, where he joined crowds of rioters demanding entry into closed areas. *See* Images 6-8. DiGiovanni exited the Capitol building through the East Rotunda Door at approximately 3:00 p.m., twenty-two minutes after he had entered. *See* Image 9. Police officers began clearing the Rotunda at roughly the same time, arriving in the Rotunda at approximately 3:00 pm. and clearing the room of rioters by approximately 3:15 p.m.



Image 6: DiGiovanni (circled in red) in Statuary Hall



Image 7: DiGiovanni (circled in red) filming in the Rotunda



*Image 8: DiGiovanni (in yellow box) in crowd of rioters demanding entrance to closed area*



*Image 9: CCTV showing DiGiovanni (circled in yellow) exiting through the East Rotunda Door at approximately 3:00 p.m.*

After exiting the building, DiGiovanni did not leave the grounds but remained on the East Front steps where he celebrated, raising his arm in the air. *See* Image 10.



Image 10: Open source video[5] of DiGiovanni on East Front Steps

2022 Media Interview

DiGiovanni was interviewed by a reporter in the fall of 2022. In that recorded interview, DiGiovanni acknowledged his presence at the U.S. Capitol on January 6, 2021 and identified himself in photographs taken inside the Capitol. He did not, however, express remorse during this interview.



Image 11: Screenshot of news article regarding DiGiovanni's interview

---

[5] Video available at:
https://ia802304.us.archive.org/33/items/mCMXh2jsLf2Y2caoh/mCMXh2jsLf2Y2caoh.mpeg4.

The Charges and Plea Agreement

In August 2023, DiGiovanni was charged in a complaint with Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); Disorderly Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2): Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). On August 15, 2023, DiGiovanni self-surrendered to FBI and was subsequently released on conditions. On December 18, 2023, the United States charged DiGiovanni with entering or remaining in a restricted building or grounds in violation of 18 U.S.C. 1752(a)(1) in a single-count Information. On January 12, 2024, pursuant to a plea agreement, DiGiovanni pleaded guilty

### III.  Statutory Penalties

DiGiovanni now faces sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment; a fine of up to $100,000; a term of supervised release of not more than one year; and a $25 special assessment. In addition, under the terms of his plea agreement, the defendant must also pay $500 in restitution to the Architect of the Capitol. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

In all meaningful respects, the government agrees with the Sentencing Guidelines calculation set forth in the PSR, to which the parties have agreed in the plea agreement:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii))[6] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Zero Point Offender Adjustment (USSG §4C1.1) | -2 |
| Total Adjusted Offense Level | 2 |

*See* PSR at ¶¶ 29-39.

While the Government concedes that Section 4C1.1 applies to DiGiovanni, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances.

---

[6] The PSR incorrectly applies this specific offense characteristic because the trespass occurred "at a secure government facility" under U.S.S.G. §2B2.3(b)(1)(A)(i). PSR ¶ at 32. As indicated in the plea agreement, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). ECF No. 35 at 3. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no impact on the final offense level.

11

Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated DiGiovanni's criminal history as a category I. PSR at ¶ 42. Accordingly, the U.S. Probation Office calculated DiGiovanni's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 83. DiGiovanni's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V.  **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days of incarceration.

A. **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing DiGiovanni's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like DiGiovanni, the absence of violent or destructive acts is not a mitigating factor. Had DiGiovanni engaged in such conduct, he would have faced additional criminal charges.

Here, DiGiovanni entered the Capitol Building despite obvious signs that he should not: the OC-spray in the air while he was on the West Plaza and Lower West Terrace; the inaugural

13

stage, still in the middle of construction (as DiGiovanni would have recognized as a construction professional himself); the verbal attacks he heard hurled at police; the broken windows and glass on the Upper West Terrace near the Senate Wing Door; and the alarms blaring as he entered through the Upper West Terrace Door. Moreover, DiGiovanni remained in the building for over twenty minutes and then continued to remain on Capitol Grounds, celebrating the mob's breach of the building after he exited. Finally, though DiGiovanni has technically accepted responsibility for his crime by pleading guilty, DiGiovanni has yet to demonstrate true remorse for his actions or to express any recognition of the import of his actions from that day. Accordingly, the nature and the circumstances of this offense establish the need for a period of 30 days of incarceration in this matter.

### B. DiGiovanni's History and Characteristics

As set forth in the PSR, DiGiovanni has no criminal history. *See* PSR ¶¶ 40-46. He is a contractor who owns and operates a family business, DiGiovanni and Sons Construction. He has also served as an alderman in his town, and previously ran for mayor in the fall of 2023.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. When DiGiovanni was confronted with pictures of himself inside the Capitol by a member of the press in 2022, DiGiovanni acknowledged his presence in the Capitol on January 6 but did not express remorse for his part in the riot at the Capitol, even as a sitting elected official at the time of the interview. The Court must sentence DiGiovanni in a manner to deter him from engaging in similar conduct in the future.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence DiGiovanni based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

DiGiovanni has pleaded guilty to Count One of the Information, charging him with Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor, 18 U.S.C. § 3559, and the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Christopher Price*, 21-cr-719, this Court sentenced the defendant to 45 days incarceration for the defendant's convictions at trial on four misdemeanors. The evidence in

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

16

that case showed the defendant had ignored numerous signs indicating that the defendant was not allowed to be on Capitol grounds or in the Capitol building on January 6, 2021. Like DiGiovanni, Christopher Price ignored signs and barricades signaling the restricted area; ignored violent and assaultive rhetoric by other members of the mob; ignored the blaring alarms, broken glass, and lines of officers; and watched as other rioters attempted to or successfully breached various doors or windows to the Capitol. *See* 21-cr-719, Doc. 134 (Gov't Sent. Memo.) at 2. DiGiovanni pleaded guilty, and thus, should be subject to a somewhat reduced sentence from the sentence imposed on Price. Acceptance aside, however, these defendants are similarly situated, and the Court should also impose a short custodial sentence on DiGiovanni.

In *United States v. Jia Lui*, 21-cr-711, Judge Kelly sentenced the defendant to four months of incarceration for Entering or Remaining in a Restricted Building or Grounds. There, like here, the defendant spent a considerable amount of time in the building, he watched as rioters attempted to breach (again) the Senate Wing Door and windows, witnessed violence between rioters and officers, and had failed before sentencing to express remorse for his conduct. There were other aggravating factors in that case not present here, including the fact that the defendant there had to be physically forced out of the Capitol Building. *See* 21-cr-711, Doc. 39 (Gov't Sent. Memo) at 11-12.  Here, DiGiovanni was not physically forced out the Building, but he exited through the East Rotunda Doors at approximately the same time that reinforcement officers arrived at the Rotunda to clear the area.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that DiGiovanni must pay $500 in restitution, which reflects in part the role DiGiovanni played in the riot on January 6.[9] Plea Agreement at 8. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* DiGiovanni's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 106.

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence DiGiovanni to 30 days incarceration, at the low end of the guideline range, twelve months supervised release, 60 hours of community service, $500 in restitution, and a $25 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on DiGiovanni's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ Katherine E. Boyles
Katherine Boyles
Assistant United States Attorney

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

19

>D. Conn. Fed. Bar No. PHV20325
>United States Attorney's Office
>601 D Street NW
>Washington, D.C. 20001
>Katherine.Boyles@usdoj.gov
>Phone: 203-931-5088